260 P.3d 1196 (2011)
In the Matter of the Application to Adopt J.M.D. and K.N.D., Minor Children.
No. 99,687.
Supreme Court of Kansas.
September 16, 2011.
*1198 Elizabeth Lea Henry, of Henry & Mathewson, P.A., of Wichita, argued the cause and was on the briefs for appellant natural father.
Martin W. Bauer, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause and was on the briefs for appellee stepfather.
The opinion of the court was delivered by JOHNSON, J.:
S.M.H. (Mother) is the biological mother of J.M.D. and K.N.D. Her current husband (Stepfather) petitioned to adopt the children without the consent of their biological father, M.A.D. (Father). The district court determined that Father's consent to the adoption was unnecessary, terminated Father's parental rights, and granted Stepfather's adoption. In a split decision, the Court of Appeals reversed, finding insufficient evidence to support the district court's determination that Father had failed to assume his parental duties for the 2 consecutive years immediately preceding the adoption petition. Stepfather seeks our review of the Court of Appeals' decision. We reverse the Court of Appeals and affirm the district court.

FACTUAL AND PROCEDURAL OVERVIEW
Mother and Father were married in 1993, and the two children involved in this action were born during the marriage; J.M.D. in 1996 and K.N.D. in 1998. J.M.D. was diagnosed with cancer in 1999 and subsequently underwent numerous hospitalizations, chemotherapy, and radiation treatments.
In November 2000, Mother and Father, who were living in Missouri, began caring for Mother's 4-year-old stepsister (H.R.B.) and Mother's 1 ½-year-old half-sister (L.H.D.) and subsequently became their official managing conservators and guardians. Between December 2000 and the summer of 2002, Mother and Father twice separated and reconciled. By July 2002, Father was unemployed and acting as the primary caretaker for all four children.
On July 18, 2002, L.H.D. sustained serious and ultimately fatal physical injuries while under Father's supervision. Social service workers removed the other children from the home, while investigating Father's culpability for the child's injuries and resulting death. On July 23, 2002, Father was charged with felony child abuse for inflicting cruel and inhuman punishment by "beating, kicking, hitting, knocking to the ground and by throwing water on L.H.D." He was released on bond, pending trial, conditioned on having no contact with the children. During the period of Father's release on bond, Mother obtained a divorce decree which granted her sole custody of the children and ordered Father to pay $254 per month for child support. After his bond was revoked for having contact with the children, Father pled to charges and was sentenced to a prison term with a mandatory release date of December 8, 2014.
In March 2003, Mother and her children relocated to Kansas, where Mother met and ultimately married Stepfather in August 2004. With Mother's consent, Stepfather petitioned to adopt J.M.D. and K.N.D. in June 2007. Stepfather's counsel filed a petition for habeas corpus, seeking to have Father brought to Kansas from the Missouri South Central Correctional Center to participate in the adoption proceedings. Missouri prison officials refused to honor the Kansas habeas *1199 corpus writ, but arrangements were made to allow Father to participate in the trial by telephone.
Claiming that his right to due process was implicated, Father sought to delay the proceedings until he could appear in person. In denying the continuance motion, the district court noted that Stepfather had made every effort to obtain Father's presence and that, notwithstanding earlier possible parole dates, Father's release was not assured until his mandatory release date in 2014, over 7 years later. Citing to the children's interest in a timely decision and the demands of judicial economy, the court found that Father's ability to participate by telephone satisfied his right to due process.
At trial, Father presented evidence of his contacts with the children while he was imprisoned, both directly through letters and telephone calls and indirectly through his sister, T.R. On the other hand, Stepfather presented the testimony of a school counselor and the children's treating psychologist, relating the impact on the children of L.H.D.'s death and Father's incarceration. Both testified that the children suffered from anxiety and symptoms of posttraumatic stress disorder and opined that they would benefit from the closure and permanency that would be attained through the adoption.
During the 2 years preceding the adoption petition, June 2005 to June 2007, Father was earning approximately $20 per month in prison wages and was receiving a veteran's disability payment of approximately $105 per month. T.R. testified that Father would provide her with money to occasionally purchase $10 or $20 gift cards for the children and to send cards and money for birthdays and Christmas. However, none of the disability payments were ever utilized to directly pay child support to Mother. In September 2006, child support enforcement authorities contacted Father about his failure to pay child support. After Father requested a reduction in the court-ordered support of $254 per month, it was set at $5 per month, presumably based solely on his prison wages. Thereafter, Father paid the $5 per month support, plus an additional $3.50 per month toward his arrearage.
At the close of evidence, the parties argued differing interpretations of a 2006 amendment to K.S.A. 59-2136(d), which added the language: "The court may consider the best interests of the child and the fitness of the nonconsenting parent in determining whether a stepparent adoption should be granted." L.2006, ch. 22, sec. 1(d). Ultimately, the district court opined that the amendment required the judge to consider the best interests of the child and the fitness of the nonconsenting parent, notwithstanding the provision's ambiguity or possible conflict with subsection (h) of the statute.
The district court then proceeded to find that Father was unfit and that the Stepfather's adoption was in the best interests of the children. Further, the trial court held that Father had failed to assume the duties of a parent for 2 consecutive years prior to the filing of the adoption petition. Accordingly, the court terminated Father's parental rights and determined that his consent to the adoption was not necessary.
Father appealed, arguing: (1) The district court misinterpreted and misapplied the stepparent adoption statute by considering Father's fitness and the best interests of the children as overriding factors in granting Stepfather's petition for adoption; (2) there was insufficient evidence to support a finding that Father's consent to the adoption was not required; and (3) Father was denied due process when the court refused to continue the trial until he could be released from prison and attend the trial in person. In a split decision, the Court of Appeals reversed the district court. In re Adoption of J.M.D., 41 Kan.App.2d 157, 202 P.3d 27 (2009) (Marquardt, J., dissenting).
Relying on In re Adoption of G.L.V., 286 Kan. 1034, 190 P.3d 245 (2008), the majority found that to dispense with the requirement of the natural father's consent to a stepparent adoption, the court must find that the nonconsenting father had failed to fulfill his parental duties for 2 consecutive years next preceding the adoption petition, regardless of any determination the court may make with respect to the natural father's fitness or the best interests of the child. J.M.D., 41 *1200 Kan.App.2d at 162-64, 202 P.3d 27. The majority acknowledged that the district court in this case had correctly applied the stepparent adoption statute by first making a determination that Father had failed to assume his parental duties so as to permit the adoption to proceed without Father's consent, and then the court independently considered Father's fitness and the best interests of the children in determining the propriety of granting the adoption. However, the majority found that the district court's determination that Father had failed to fulfill his parental duties was not supported by substantial and competent evidence. 41 Kan.App.2d at 164-70, 202 P.3d 27.
The dissent took issue with the majority's statutory interpretation, opining that eliminating Father's fitness and the best interests of the children as factors to consider in determining whether the natural parent's consent was required rendered meaningless the 2006 amendment to K.S.A. 59-2136(d). See 41 Kan.App.2d at 174-75, 202 P.3d 27 (Marquardt, J., dissenting). Further, the dissent disagreed with the majority's assessment of Father's efforts toward fulfilling his parental duties, finding such efforts should be ignored as incidental. 41 Kan.App.2d at 175, 202 P.3d 27.
In seeking review, Stepfather separately states a number of issues. He contends the Court of Appeals misinterpreted G.L.V., as that case relates Father's unfitness to the determination of whether consent is required and misconstrued the time period which may be considered when determining whether Father has failed or refused to assume parental duties. He urges an interpretation of K.S.A. 2010 Supp. 59-2136(d), whereby the word "must" means "may," rather than being the equivalent of "shall." Additionally, Stepfather urges this court to revisit the judicially created "two-column ledger" approach in applying K.S.A. 2010 Supp. 59-2136(d) and to replace it with a totality of the circumstances analysis. In essence, then, Stepfather is challenging the manner in which appellate courts have interpreted and applied the stepparent adoption provisions of K.S.A. 2010 Supp. 59-2136(d).
With respect to the unique facts of this case, Stepfather asserts that the evidence was sufficient to support the district court's findings and that the Court of Appeals erred in making its own findings that Father financially and emotionally supported his children in a significant and appropriate manner. We will look first at the legal framework for analyzing whether a father's consent is necessary in a stepparent adoption and then evaluate the sufficiency of the evidence in this case to support the district court's finding that Father's consent was not required.

STATUTORY FRAMEWORK

A. Standard of Review

Statutory interpretation is a legal question over which appellate courts exercise unlimited review, unfettered by the trial court's interpretation. State v. Bryan, 281 Kan. 157, 159, 130 P.3d 85 (2006).

B. Analysis

Our obvious starting point when considering how a statutory procedure is supposed to operate is to look at the applicable statutes. Generally, Article 21 of Chapter 59 of the Kansas Statutes Annotated governs adoptions. Specifically, K.S.A. 2010 Supp. 59-2136 applies where a relinquishment or consent to an adoption has not been obtained from a natural parent, and the court is permitted to determine the necessity of such a relinquishment or consent. K.S.A. 2010 Supp. 59-2136(a). Even more specific to our case, K.S.A. 2010 Supp. 59-2136(d) applies when a stepfather seeks to adopt his wife's children. That provision states:
"(d) In a stepparent adoption, if a mother consents to the adoption of a child who has a presumed father under subsection (a)(1), (2) or (3) of K.S.A. 38-1114 and amendments thereto, or who has a father as to whom the child is a legitimate child under prior law of this state or under the law of another jurisdiction, the consent of such father must be given to the adoption unless such father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption or is incapable of giving *1201 such consent. In determining whether a father's consent is required under this subsection, the court may disregard incidental visitations, contacts, communications or contributions. In determining whether the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption, there shall be a rebuttable presumption that if the father, after having knowledge of the child's birth, has knowingly failed to provide a substantial portion of the child support as required by judicial decree, when financially able to do so, for a period of two years next preceding the filing of the petition for adoption, then such father has failed or refused to assume the duties of a parent. The court may consider the best interests of the child and the fitness of the nonconsenting parent in determining whether a stepparent adoption should be granted." (Emphasis added.) K.S.A. 2010 Supp. 59-2136(d).
The italicized last sentence was added in 2006. L.2006, ch. 22, sec. 1(d). What role the unfitness of a nonconsenting parent plays in a stepparent adoption is the principal question presented in this appeal. However, before focusing our attention on the specific language of this subsection (d), we pause to consider how it fits with the other provisions of K.S.A. 2010 Supp. 59-2136, in order to fulfill our directive to construe the various provisions of an act in pari materia. See Pankratz Implement Co. v. Citizens Nat'l Bank, 281 Kan. 209, 215, 130 P.3d 57 (2006).
As noted, subsection (a) describes the applicability of K.S.A. 2010 Supp. 59-2136. Subsection (b) clarifies that, wherever practicable, the statute's provisions applicable to the father shall also apply to the mother, and vice versa. Subsection (c) addresses the appointment of an attorney to represent any father who is unknown or whose whereabouts are unknown, and it directs the court to publish notice where no person is identified as the father or possible father.
Pointedly, subsection (c) differentiates between stepparent adoptions and all other cases. In stepparent adoptions, the court "may" appoint an attorney, but "[i]n all other cases, the court shall appoint an attorney." K.S.A. 2010 Supp. 59-2136(c).
Subsection (e) directs that, when a mother desires to relinquish or consent to the adoption of her child, "a petition shall be filed in the district court to terminate the parental rights of the father, unless the father's relationship to the child has been previously terminated or determined not to exist by a court." K.S.A. 2010 Supp. 59-2136(e). However, the subsection commences by declaring that the provisions of subsection (d), addressing stepparent adoptions, are specifically excepted from the termination provisions set forth in K.S.A. 2010 Supp. 59-2136(e). In other words, a petition to terminate the father's parental rights is not mandated in a stepparent adoption.
Subsection (f) addresses the manner by which notice is to be given to the person identified as the father or possible father. Subsection (g) clarifies that the court need not go through the termination of parental rights procedure set forth later in the statute, if the court has been unable to identify a possible father and no one has claimed custodial rights for the child.
Subsection (h) is important to our understanding of subsection (d). Before taking a close look at that subsection, we note that the last subsection, K.S.A. 2010 Supp. 59-2136(i), addresses the impact of the termination of parental rights on the right to inherit of both the birth parents and the child. Returning to subsection (h), we set out that provision in its entirety, noting in italics the relevant 2006 changes made in H.B. 2665 at the same time the last sentence of subsection (d) was added. See L.2006, ch. 22, sec. 1(h).
"(h)(1) When a father or alleged father appears and asserts parental rights, the court shall determine parentage, if necessary pursuant to the Kansas parentage act. If a father desires but is financially unable to employ an attorney, the court shall appoint an attorney for the father. Thereafter, the court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of any of the following:

*1202 (A) The father abandoned or neglected the child after having knowledge of the child's birth;
(B) the father is unfit as a parent or incapable of giving consent;
(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;
(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;
(E) the father abandoned the mother after having knowledge of the pregnancy;
(F) the birth of the child was the result of rape of the mother; or
(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition.
"(2) In making a finding whether parental rights shall be terminated under this subsection, the court may:
(A) Consider and weigh the best interest of the child; and

(B) disregard incidental visitations, contacts, communications or contributions.
"(3) In determining whether the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption, there shall be a rebuttable presumption that if the father, after having knowledge of the child's birth, has knowingly failed to provide a substantial portion of the child support as required by judicial decree, when financially able to do so, for a period of two years next preceding the filing of the petition for adoption, then such father has failed or refused to assume the duties of a parent." (Emphasis added.) K.S.A. 2010 Supp. 59-2136(h).
In his supplemental brief filed with this court, Stepfather suggests that the 2006 addition of the provision in K.S.A. 59-2136(h)(2)(A), permitting the court to consider and weigh the best interest of the child in deciding whether to terminate parental rights under subsection (h), manifests a legislative intent "to allow a trial court, within its discretion, to use the child's best interest, or parent's unfitness, or both, as considerations for deciding whether or not to terminate a parent's rights in a stepparent adoption" under subsection (d). The apparent notion is that the legislature intended to impliedly incorporate the provisions of subsection (h) into the stepparent provisions of subsection (d). Both the statutory language and legislative history of K.S.A. 2010 Supp. 59-2136 belie such an intent.
K.S.A. 59-2136 originated in 1990, as part of the Kansas Adoption and Relinquishment Act. See L.1990, ch. 145, sec. 26 (S.B. 431). The Act was the result of a study by the Family Law Advisory Committee on Kansas adoption and relinquishment laws, and the purpose of the bill was to consolidate the applicable laws which were previously scattered throughout multiple articles in two different chapters of the Kansas Statutes. See Minutes of the House Judiciary Committee, March 28, 1990, Attachment 3. During hearings on the bill, the Advisory Committee presented its comments on each of the new and amended provisions within the Act. Accompanying the section which would become K.S.A. 59-2136(d) was the following comment:
"Subsection (d) limits the grounds for termination of certain natural fathers' parental rights in connection with stepparent adoptions. Generally, if the child was the product of a marriage or attempted marriage, the consent of the father must be obtained unless there was a failure to assume parental duties for two years. The committee justifies this differing treatment of certain fathers in stepparent adoptions on the basis there is not the urgency to create a new family for the child since the child is residing with the mother and stepfather." (Emphasis added.) Minutes of the House Judiciary Committee, March 28, 1990, Attachment 3.
The clearly stated intent was to treat the parental rights termination of natural or presumed fathers differently in stepparent adoptions than in other types of adoptions. That stated intent contradicts any implication that the legislature intended to incorporate the *1203 parental termination provisions of subsection (h) into the stepparent adoption provisions of subsection (d).
Moreover, the 2006 amendments to K.S.A. 59-2136 do not indicate a legislative intent to change the original enactment's purposefully disparate treatment of fathers in stepparent adoptions. After the amendments, subsection (c) retained its different provision for appointing an attorney for unknown fathers in a stepparent adoption, and subsection (e) still excepted stepparent adoptions from the requirement of filing a petition to terminate the parental rights of the father. Perhaps more to the point, the 2006 change in subsection (h) permitting the district court to consider and weigh the best interest of the child was explicitly made applicable when the court is making a finding "whether parental rights shall be terminated under this subsection." (Emphasis added.) K.S.A. 2010 Supp. 59-2136(h)(2). If a court is determining under subsection (d) whether a father has failed to assume the duties of a parent within the preceding 2 years, it is not making a finding whether parental rights should be terminated under subsection (h). Likewise, the subsection (d) addition in 2006 makes consideration of the best interests of the child and the fitness of the nonconsenting parent applicable to the determination of "whether a stepparent adoption should be granted," rather than being applicable to the prefatory determination of whether father's rights should be terminated to make way for the adoption.
In short, the termination of parental rights provisions in K.S.A. 2010 Supp. 59-2136(h) simply do not apply to the question of whether a natural father must consent to the adoption of his children by a stepfather. The legislature intended for that question to be answered by the provisions of K.S.A. 2010 Supp. 2136(d), unaffected by the provisions governing the termination of parental rights in other types of adoptions. Stepfather's policy argumentthat it should not be more difficult to terminate the parental rights of a father in a stepparent adoption than it is to terminate a father's parental rights in a stranger adoptionare more properly directed to the legislature. See O'Bryan v. Columbia Ins. Group, 274 Kan. 572, Syl. ¶ 2, 56 P.3d 789 (2002) ("Courts should avoid making public policy where the statutory law has developed.").
The Court of Appeals appropriately decided the matter based solely on the provisions of K.S.A. 2010 Supp. 59-2136(d), which the panel construed in light of its understanding of our decision in G.L.V. That case was our first opportunity to apply K.S.A. 59-2136(d) after the 2006 amendments. Stepfather contends that G.L.V. contained incorrect dicta, which the Court of Appeals misapplied to reach an incorrect result.
G.L.V. involved an attempted stepparent adoption without the natural father's consent, where father had paid court-ordered child support, plus additional amounts on an arrearage, for over 3 years preceding the filing of stepfather's adoption petition. However, father had not had any significant contact with his children for the 9 years prior to the adoption proceedings, albeit father's parents and other family members had maintained a relationship with the children. Unlike the present case, the father in G.L.V. was not incarcerated.
The district court in G.L.V. noted that Kansas cases had created a two-sided ledger approach to determining whether a parent has failed to perform his or her parental duties during the 2 years before an adoption petition is filed: "On one side of the ledger is the `"love and affection"' that a parent shows his or her child; on the other is the financial support provided during that time." G.L.V., 286 Kan. at 1038, 190 P.3d 245. The district court noted further that a parent must fail both sides of the ledger to have his or her parental rights terminated, i.e., to permit the stepparent to adopt the children without the natural parent's consent. The court found that the two-sided ledger formula would require a denial of the adoption in that case because the natural father had provided sufficient child support to pass the financial test, even though the father "`miserably'" failed the "`"love and affection" test.'" 286 Kan. at 1038, 190 P.3d 245.
However, the district court struggled with how the 2006 amendment to subsection (d) permitting the district court to consider best *1204 interests of the child and the fitness of the nonconsenting natural fatherwas suppose to affect the judicially created two-sided ledger test. Ultimately, the district court opined that there was no evidence that father was an unfit parent and that "`[consideration of the best interest of the children does not clearly favor one parent over the other,'" so that the outcome reached under the ledger test in that case was not altered by the 2006 amendment to K.S.A. 59-2136(d).
A divided panel of the Court of Appeals affirmed the district court,
"concluding that the 2006 amendment to K.S.A. 59-2136(d) did not abrogate the parental duties test (based on the two-sided ledger) previously adopted by the Kansas Supreme Court in [In re Adoption of B.M.W., 268 Kan. 871, 2 P.3d 159 (2000),] and [In re Adoption of K.J.B., 265 Kan. 90, 959 P.2d 853 (1998),] even though it granted a district court discretionary authority to consider the best interests of the child and the fitness of the nonconsenting parent. [In re Adoption of G.L.V., 38 Kan. App.2d 144, 154-55, 163 P.3d 334 (2007)]." 286 Kan. at 1039, 190 P.3d 245.
The stepfather sought review with this court, arguing in the alternative that, after the 2006 amendment to K.S.A. 59-2136(d), either: (1) the best interests of the child involved in a contested stepparent adoption are an overriding factor in determining whether to grant the adoption; or (2) the court-made two-sided ledger has been converted to a three-column ledger with love and affection in one column, financial support in another, and the best interests of the child in the third column, all entitled to equal weight and consideration.
In its comprehensive review of the Court of Appeals decision, this court traced the history of stepparent adoption proceedings in this state, specifically looking at the decisions in In re Adoption of B.M.W., 268 Kan. 871, 2 P.3d 159 (2000); In re Adoption of K.J.B., 265 Kan. 90, 959 P.2d 853 (1998); In re Adoption of S.E.B., 257 Kan. 266, 891 P.2d 440 (1995); In re Adoption of F.A.R., 242 Kan. 231, 747 P.2d 145 (1987); In re Adoption of C.R.D., 21 Kan.App.2d 94, 897 P.2d 181 (1995); and In re Adoption of Baby Boy S., 16 Kan.App.2d 311, 822 P.2d 76 (1991). That review called into question the legitimacy of the two-sided ledger test.
G.L.V. described how the two-sided ledger test had originated in a concurring opinion in C.R.D. that advocated for an approach that "was clearly at odds with the previous decisions of Kansas courts, which had consistently held that a determination as to whether the nonconsenting parent had failed to assume parental duties was based on a review of all of the circumstances. See, e.g., S.E.B., 257 Kan. at 273, 891 P.2d 440; F.A.R., 242 Kan. at 236, 747 P.2d 145." G.L.V., 286 Kan. at 1049, 190 P.3d 245. G.L.V. pointed out that the newly proposed test had restricted the factors to be considered to only two parental dutieslove and affection, and financial supporteven though "there are numerous duties associated with being a parent to a child." 286 Kan. at 1049, 1054, 190 P.3d 245. Moreover, we opined in G.L.V. that the statutory interpretation in the C.R.D. concurrence "was only loosely based on the language of K.S.A. 59-2136(d)" and that the C.R.D. majority completely ignored the statutory rebuttable presumption arising from insubstantial payment of judicially decreed child support. G.L.V., 286 Kan. at 1049, 190 P.3d 245.
G.L.V. later clarified that C.R.D.'s refusal to apply the statutory presumption was based on an overbroad declaration of a natural parent's constitutional rights. 286 Kan. at 1058-60, 190 P.3d 245. Moreover, the opinion intimated that this court's adoption of the two-sided ledger test in K.J.B. was suspect because the K.J.B. opinion did not comment on the constitutional considerations in play or discuss the effect on its decision of the statutory rebuttable presumption. 286 Kan. at 1050, 190 P.3d 245. Nevertheless, G.L.V. avoided explicitly disapproving the two-sided ledger paradigm because that "approach [was] not under attack in [that] appeal" and because the specific, narrow questions posed in the stepfather's petition for review could be answered without such a holding. 286 Kan. at 1054, 190 P.3d 245.
We note, however, that the G.L.V. opinion also cited to the rationale in B.M.W., 268 Kan. at 880-84, 2 P.3d 159, where the court *1205 found it persuasive that the legislature had not amended K.S.A. 59-2136(d) to set forth an alternative framework to the two-sided ledger approach after its judicial pronouncement. See G.L.V., 286 Kan. at 1054, 190 P.3d 245. Here, we have the 2006 legislative amendment, even though G.L.V. questioned whether that change was aimed at the two-sided ledger aspect of the stepparent adoption procedure. Nevertheless, this court has not always found that legislative inaction, even for long periods of time, precludes the subsequent correction of judicially created rules which are contrary to plainly worded statutes. See State v. Gunby, 282 Kan. 39, 49-50, 144 P.3d 647 (2006) (abrogating judicially created rules governing independent admissibility of K.S.A. 60-455 evidence of prior crimes or civil wrongs notwithstanding legislative inaction for decades); see also Casco v. Armour Swift-Eckrich, 283 Kan. 508, 521-29, 154 P.3d 494 (2007) (abrogating judicially created parallel injury rule notwithstanding legislative inaction for 76 years).
This is a circumstance where legislative inaction should not control our decision. The two-sided ledger formulation was cut from whole cloth to address a nonexistent constitutional infirmity and to fix a situation that was not broken. As G.L.V. explained:
"As this discussion of the development of Kansas stepparent adoption law demonstrates, we have consistently repeated that all surrounding circumstances are to be considered when determining whether a natural parent must consent to a stepparent adoptionthat is, whether the natural parent has `assumed[d] the duties of a parent for two consecutive years next preceding the filing of the petition for adoption or is incapable of giving such consent.' See K.S.A. 2007 Supp. 59-2136(d); B.M.W., 268 Kan. at 882, 2 P.3d 159. This statement recognizes that there are numerous duties associated with being a parent to a child, and all such dutieseven though not explicitly enumeratedmay be considered." 286 Kan. at 1053-54, 190 P.3d 245.
Accordingly, we now take the step which was justified by our analysis in G.L.V.; we put to rest the artificial constraints of the two-sided ledger approach and return to the historical approach of considering "all surrounding circumstances." See G.L.V., 286 Kan. at 1044-46, 1049, 1053, 190 P.3d 245. Likewise, effect must be given to the plainly stated statutory rebuttable presumption
"that if the father, after having knowledge of the child's birth, has knowingly failed to provide a substantial portion of the child support as required by judicial decree, when financially able to do so, for a period of two years next preceding the filing of the petition for adoption, then such father has failed or refused to assume the duties of a parent." K.S.A. 2010 Supp. 59-2136(d).
Of course, a natural father is still free to argue that the stepparent has failed to establish the conditions precedent to the presumption set forth in the statute, such as the father's financial ability to pay the judicially decreed child support amount. Or, a natural father might still argue that his "showering of affection" on the child or the performance of other parental duties has effectively rebutted the statutory presumption emanating from financial nonsupport.
Likewise, on the flip side, a district court is not precluded from considering a natural father's unfavorable child support payment performance as part of "all of the surrounding circumstances," even though all of the conditions for the statutory presumption have not been met. In other words, as we call on district courts to do in many other contexts, the trial court must look at the totality of the circumstances when determining whether a natural father has failed to assume his parental duties under K.S.A. 2010 Supp. 59-2136(d).
Our modification of the formula for determining whether a parent has failed to assume parental duties does not change our decision in G.L.V. that such a failure of parental duties must be found before the court can factor in the best interests of the child. We stand by our holding that "the best interests of the child as expressed in the 2006 amendment [to K.S.A. 59-2136(d)] does not trump the requirement that a natural parent who has assumed his or her parental responsibilities *1206 must consent before a stepparent adoption can be granted." 286 Kan. at 1063, 190 P.3d 245.
What remains to be determined is the role that fitness of the nonconsenting parent should play in the stepparent adoption procedure. Contrary to Stepfather's assertion about the dicta in G.L.V., that opinion included an explicit disclaimer:
"We observe that our decision in this case does not extend to the statutory language in the amendment dealing with the `fitness of the nonconsenting parent.' K.S.A. 2007 Supp. 59-2136(d). Unfitness was simply not an issue in this case. As the district court noted in its decision, there was no allegation of unfitness of the natural father. No evidence was presented on this issue upon hearing before the district court, and the stepfather has raised no question of unfitness on appeal. Thus, we do not in this opinion determine what the legislature intended by this phrase, except to acknowledge that the fitness of a nonconsenting parent is a much different question." 286 Kan. at 1063-64, 190 P.3d 245.
Perhaps the logically consistent approach would be to treat the fitness factor the same as the best-interests-of-the-child factor and direct that the district court must make a finding on whether the natural father has assumed parental duties within the preceding 2 years, i.e., whether the natural father's consent is required, before looking at the fitness of the natural father. The problem with that approach is finding a purpose to be served by a parental fitness assessment at that stage of the proceeding. See State v. Trautloff, 289 Kan. 793, 797, 217 P.3d 15 (2009) (courts presume legislature does not intend to enact useless or meaningless legislation); see also State v. Preston, 287 Kan. 181, 184, 195 P.3d 240 (2008) (when legislature revises existing law, court presumes legislature intended to change law as it existed prior to amendment).
In G.L.V., we recognized the dilemma of finding a purpose for the 2006 amendments when we said that
"[t]he additional language expressly authorizing a court to consider the best interests of the child in determining whether to grant a stepparent adoption provides the court with additional discretionary powers to consider the best interests of the child in denying the adoptioneven where a natural parent has not assumed the duties of a parent as articulated by this court for unique reasons." (Emphasis added.) 286 Kan. at 1064, 190 P.3d 245.
The opinion then set forth some examples of where it might be best not to grant the stepparent an adoption, even though the natural father's consent is not required because of a failure to assume parental duties. Unfortunately, that stated purpose does not translate well to explain why the fitness of the nonconsenting parent language was included in the 2006 amendment.
It makes scant sense to say that a stepparent adoption may proceed without the natural father's consent because he has failed to assume his parental duties, i.e., his parental rights may be terminated for unfitness, yet the district court has the discretion to deny the adoption because of the fitness of the nonconsenting parent. How can the natural father be at once unfit for purposes of excusing consent but fit for purposes of denying the adoption? Likewise, if the unfitness factor was meant to refer to acts or omissions more than 2 years prior to the filing of the stepparent adoption petition, then the 2-year language in 59-2136(d) is rendered meaningless and that subsection becomes the equivalent of the subsection (h) termination provisions.
Nevertheless, we must attempt to find a resolution to the ambiguities which the legislature has created and declined to remedy. Such a resolution cannot produce a bright-line rule, easy of application. We must attempt to read the added language permitting consideration of the fitness of the nonconsenting parent in conjunction with the mandate to determine from all of the surrounding circumstances whether the natural parent has assumed his or her parental duties. Accordingly, we hold that a natural parent's unfitness will not obviate the need for his or her consent to a stepparent adoption, unless the district court finds that the *1207 unfitness has prevented the natural parent from assuming the duties of a parent for 2 consecutive years next preceding the filing of the petition for adoption. For instance, a father may be communicating with his children on more than an incidental basis quantitatively, but because of the father's unfitness the contacts might be deemed to be psychologically or emotionally abusive for the children. In such an event, the district court might find that the natural father has failed to assume his parental duty of safeguarding his children's physical, mental, or emotional health. See K.S.A. 2010 Supp. 38-2202(d) (definition of a child in need of care).
Before moving on, we pause to note that Stepfather also mentioned the argument in Judge Marquardt's Court of Appeals dissent that suggested that the word "must" in 59-2136(d) should be read as "may." See J.M.D., 41 Kan.App.2d at 175, 202 P.3d 27. We presume the argument is addressed to the portion of K.S.A. 2010 Supp. 59-2136(d) that says "the consent of such father must be given to the adoption unless such father has failed or refused to assume the duties of a parent...." (Emphasis added.) If so, we need not extend the discussion. The context in which the word "must" is used in that phrase leaves no room for speculation; it was intended to convey that the consent is mandatory.

SUFFICIENCY OF THE EVIDENCE
The Court of Appeals correctly observed that "[w]hether a parent has refused or failed to assume parental duties for the 2 years prior to the filing of the adoption petition presents a question of fact." J.M.D., 41 Kan.App.2d at 165, 202 P.3d 27. However, the panel found insufficient evidence to support the district court's finding on that question and reversed. See 41 Kan.App.2d at 170, 202 P.3d 27.

A. Standard of Review

Stepfather argues that the panel applied the incorrect standard of review and inappropriately retried the facts of the case. Citing to In re B.D.-Y., 286 Kan. 686, 705, 187 P.3d 594 (2008), he contends the correct standard should be: "whether after a review of all the evidence, viewed in the light most favorable to the petitioners, a rational fact finder could have found that [sic] the determination to be highly probable." Stepfather's proposed standard applies to child in need of care determinations; the proper appellate standard of review for stepparent adoptions is for substantial competent evidence. See 286 Kan. at 702, 187 P.3d 594; see also B.M.W., 268 Kan. at 882-83, 2 P.3d 159 ("Under K.S.A. 59-2136(d), whether a parent has refused or failed to assume parental duties for 2 years prior to filing an adoption petition is a question of fact, reviewed on appeal only to determine whether the decision is supported by substantial competent evidence.").
In assessing the sufficiency of the evidence, an appellate court should not reweigh the evidence or pass on the credibility of witnesses. Rather, the appellate court should review the facts of the case in the light most favorable to the prevailing party below to ascertain whether the trial court's decision is properly supported by substantial competent evidence. In re Adoption of A.J.P., 24 Kan.App.2d 891, 892-93, 953 P.2d 1387 (1998). In other words, appellate review of factual questions should accord a great deal of deference to the trial judge's determination, even in those instances where the appellate jurists might have decided the case differently.

B. Analysis

Given the Court of Appeals' reliance on G.L.V., it might be helpful to begin by pointing out some rather significant distinctions between that case and the one currently before us. There, the district court specifically found that there was no evidence that the father was an unfit parent. See G.L.V., 286 Kan. at 1064, 190 P.3d 245 (no evidence presented on issue of unfitness in district court and no allegation of unfitness raised on appeal). Here, the district court declared that the stepfather had established the father's unfitness by clear and convincing evidence.
Perhaps more importantly, in G.L.V. the district court denied the stepparent adoption petition based upon its finding that the natural *1208 father's consent was required. The decisions of both the Court of Appeals and this court affirmed the trial court's determination that the natural father had assumed his parental duties within the 2 years preceding the adoption proceedings. In contrast, here, the Court of Appeals reversed the district court's granting of the adoption, overruling the trial judge's finding that Father had not assumed his parental duties within the 2 years preceding the adoption. That result required the Court of Appeals to find that, even viewing the evidence in the light most favorable to Stepfather (who prevailed below) and without reweighing evidence or assessing witness credibility, there was insufficient competent evidence to support the trial court's determination of a failure of parental duties. See J.M.D., 41 Kan.App.2d at 170, 202 P.3d 27. We disagree with that assessment based on all of the surrounding circumstances.
We do agree, however, that the evidence did not support the district court's finding that Stepfather had established nonpayment of child support sufficient to trigger K.S.A. 2010 Supp. 59-2136(d)'s rebuttable presumption of a nonassumption of parental duties. In G.L.V., we reiterated that adoption statute provisions purporting to eliminate the necessity of a natural parent's consent to adopt based on the parent's failure to fulfill parental obligations must be "`strictly construed in favor of maintaining the rights of natural parents.'" 286 Kan. at 1042, 190 P.3d 245 (quoting B.M.W., 268 Kan. at 881-82, 2 P.3d 159). Accordingly, Father's nonperformance must literally meet all of the stated conditions of the statutory presumption.
For the presumption to arise, the father's failure to provide a substantial portion of the judicially decreed child support must have been for the 2-year period immediately preceding the filing of the adoption petition. As the Court of Appeals noted, after Father's judicially decreed child support was lowered to $5 per month, he paid all of that amount for the last 10 months before the adoption proceedings commenced. 41 Kan.App.2d at 166, 202 P.3d 27. There was not 2 consecutive years of nonpayment of court-ordered child support, even though the modified court order may have been obtained by withholding information about the $105 monthly veteran's benefits. Under a strict and literal reading of K.S.A. 2010 Supp. 59-2136(d), the circumstances necessary to create the statutory rebuttable presumption were simply not present.
Where we part company with the Court of Appeals opinion is its declaration that "the statute does not require a parent to provide court-ordered child support to the extent to which the parent is financially able in order to establish such parent has assumed his or her duties under K.S.A. 2008 Supp. 59-2136(d)." 41 Kan.App.2d at 167, 202 P.3d 27. The panel suggests that if Father can establish that he was financially unable to pay a substantial portion of the premodification court-ordered amount of $254 per month, then he had no duty as a parent to pay any amount of support. To the contrary, even if the statutory presumption is not in effect, a parent still has a duty to support his or her child to the extent to which the parent is financially able. See State ex rel. Secretary of SRS v. Bohrer, 286 Kan. 898, 906, 189 P.3d 1157 (2008) ("Parents have a common-law duty to support their minor children, regardless of any statute imposing such an obligation."). Before modification, Father had a parental duty to pay as much of the $254 as he was able. Further, he had an obligation to disclose the existence of his $105 per month veteran's payments when the court was modifying child support and he had a duty to pay as much of his $125 per month income as he was financially able to pay, both before and after the modification of the judicially decreed amount. Father did not pay all that he could, and the evidence supports the district court's finding that child support payments were incidental and insufficient to establish an assumption of parental duty.
With respect to the emotional support aspect of parental duties, the Court of Appeals engaged in a quantitative analysis of the contacts Father had with the children during the 2 years preceding the adoption. The panel opined, apparently based on its interpretation of G.L.V., that "we do not consider, and are prohibited from considering in this *1209 stepparent adoption proceeding, the events leading up to Father's incarceration or his fitness as a parent in light of the events that transpired." J.M.D., 41 Kan.App.2d at 170, 202 P.3d 27. We disagree.
The parental duty involved is to provide for and nurture the children's mental and emotional health, rather than to simply make frequent contact with the children. A father who verbally berates and abuses his child is not assuming a parental duty, even if that contact is made three times a day. Moreover, an assessment of the effect on the child of the contact and communications between father and child cannot be divorced from their prior relationship, e.g., a child having observed his father kill another child.
The district court in this case had the opportunity to hear all of the witnesses, including the children's counselor and treating psychologist. We are unprepared to say that, viewing the evidence in the light most favorable to granting the adoption, that the evidence was insufficient to establish that Father had failed to assume the parental duty of providing for his children's psychological and emotional health in the 2 years next preceding the adoption petition. Accordingly, we affirm the district court and reverse the Court of Appeals.

ATTORNEY FEES
In the Court of Appeals, court-appointed counsel for the indigent natural father sought attorney fees and costs. The panel noted that the trial court had awarded attorney fees to Father's trial counsel as costs of the action, which were then assessed against the Stepfather, as petitioner. Citing to In re Adoption of D.S.D., 28 Kan.App.2d 686, 687-88, 19 P.3d 204 (2001), the panel opined that "the district court below had the authority to assess the fees of Father's court-appointed trial counsel against Stepfather." J.M.D., 41 Kan.App.2d at 172-73, 202 P.3d 27. Therefore, the panel found that, pursuant to Supreme Court Rule 7.07(b) (2010 Kan. Ct. R. Annot. 62), the Court of Appeals had discretionary authority to assess against Stepfather the attorney fees of Father's court-appointed appellate counsel. 41 Kan.App.2d at 173, 202 P.3d 27. However, the panel exercised its discretion to reduce the claimed hourly rate of $200 to the rate established for court-appointed attorneys in criminal cases, which was $80 per hour. The resulting total award was $3,941.76. See 41 Kan.App.2d at 173-74, 202 P.3d 27.
Neither party has sought review of the Court of Appeals' ruling on those appellate attorney fees. However, Father's court-appointed attorney has moved this court for additional fees in connection with the petition for review proceedings. That motion is timely under Supreme Court Rule 7.07(b) and is accompanied by the required affidavit. Father's attorney claims to have performed 16 hours of professional services and to have advanced $245.91 in costs. Again, the attorney requests to be paid at the customary billing rate in Sedgwick County of $200 per hour, which counsel contends is consistent with her experience and ability.
Stepfather's response to the motion for attorney fees is somewhat obtuse and takes the form of four statements. The first statement is that the "birth father filed the appeal and therefore he should be ordered to bear the attorney's fees for his counsel." Of course, that was an argument to make in the Court of Appeals. It is the Stepfather who filed the petition for review in this court, causing Father to incur additional attorney fees.
Stepfather's second point is that "the trial counsel fees should have been adjusted under the Court of Appeals' holding but that type of authority was not available to the trial court." We confess to some confusion as to how that point impacts the decision before us. We do, however, understand Stepfather's third point, which is essentially that this court should follow the lead of the Court of Appeals and approve a lower fee. Finally, in his fourth point, Stepfather advises that he has lost his job but continues to support the two children involved in this appeal, as well as three others.
The Court of Appeals acknowledged that "it may appear harsh to require a prospective adoptive parent to pay attorney fees for an attorney appointed to represent the parental rights of [an] indigent biological parent." *1210 41 Kan.App.2d at 173, 202 P.3d 27. Accordingly, the panel ameliorated that harshness by adjusting the hourly rate to comport with criminal defense appointments. We concur with that method of balancing the interests of all concerned. Therefore, we award attorney fees at the hourly rate of $80, which results in an assessment of fees and costs against Stepfather for the proceedings in connection with the petition for review of $1,525.91.
Judgment of the Court of Appeals reversing the district court is reversed; judgment of the district court is affirmed.
DAVIS, C.J., concurs in the result.